## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

Jason B. Lee,
4813 Chichester House Road
Olney, MD 20832

        Plaintiff,

    v.                                                                    Civil Action No. 1:19-cv-02284

William P. Barr, Attorney General of the
United States, United States
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

and

Stacy Sabillia (Last name phonetic)
In his Individual Capacity
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

And

Marie Barr Santangelo
In her Individual Capacity
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

        Defendants,

_____

## FIRST AMENDED COMPLAINT

    NOW COMES Plaintiff, Jason Lee, ("Plaintiff", "Lee") by way of his attorney, Morris E.

Fischer, Esq. and brings action against the U.S. Department of Justice ("DOJ"), Stacy Sabilla

(Last name phonetic) and Marie Barr Santangelo herein referred to as "Defendants" for reasons

therefore states that at all times mentioned in this complaint:

1

1.      This action is brought under Title VII of the 1964 Civil Rights Act, 42 U.S.C Sec. 2000e et seq., as amended, the Equal Protection Clause of the Fifth Amendment, the Due Process Clause of the Fifth Amendment and the First Amendment of the Constitution of the United States.  Plaintiff brings this action against his former employer for discriminatory actions, and two individualsbased upon his race and national origin and the aforementioned Constitutional violations, the result of which caused his termination.

2.      Jurisdiction of this Court is invoked pursuant to 42 U.S.C. Sec. 2000e and the Constitution of the United States

3.      Venue in this district is appropriate because the acts of discrimination alleged occurred in Washington, DC where Plaintiff was employed by Defendants.

4.      Plaintiff has exhausted all required administrative procedures for pursuing his complaint of discrimination.

**PARTIES**

5.      Plaintiff, Jason B. Lee is a former Senior Intelligence Officer employed by the Federal Bureau of Investigation Technical Intelligence Directors Office in Washington, D.C.

6.      Defendant William J. Barr is the Attorney General of the United States and head of the Department of Justice.

7.      Defendant Department of Justice is a federal department charged with enforcing the laws of the United States and oversees the Federal Bureau of Investigation.

8.      The Federal Bureau of Investigation is the chief investigative and law enforcement arm of the Department of Justice and the former employer of the Plaintiff.

9.      Defendant's agents are certain employees, supervisors, investigators, polygraph examiners employed by the Security Division, Polygraph Unit and other such divisions of the

Department of Justice or FBI responsible for administering polygraph examinations and conducting security investigations on individuals who have or are seeking security clearances, whose names are currently unascertained. Defendants Sabilla and Santangelo are being sued in their individual capacity.

10.     Defendant Barr is the Attorney General of the United States, named in his official capacity pursuant to 42 U.S.C. § 2000e-16.

11.     Defendants do business and are located in the District of Columbia.

12.     Defendant Barr is properly named as the head of the Agency pursuant to 42 U.S.C. § 2000e-16(c).

13.     Plaintiff has filed timely complaints of discrimination and retaliation with his federal employer and more than 180 days have passed since the filing.

14.     Therefore, this court has jurisdiction over these claims under 42 U.S.C. §§ 2000e–5 & –16 (2012).

## BRIEF STATEMENT OF FACTS

15.     Plaintiff entered service with the FBI on August 10, 2003.

16.     His most recent position with the Bureau was as a Senior Intelligence Officer-Technical Intelligence, assigned to the Directorate of Intelligence.

17.     As part of his employment the Plaintiff held a Top Secret Security Clearance.

18.     Plaintiff, who was born on March 10, 1978 in the United States, is of Chinese ancestry.

19.     Plaintiff's parents, are both U.S. citizens, mother was naturalized from Hong Kong, at that time a British province; father has "derived citizenship status" as the son of a U.S Army soldier/World War II veteran.

20.  Plaintiff's father was employed for 30 years with the Department of Energy and is not a government contractor.

21.  The Plaintiff is a graduate of Georgetown University and Johns Hopkins University holding both a B.S. degree in Business Administration and financial engineering and a Masters Degree in Global Security Studies.

22.  Plaintiff started his career with the FBI as a Forensic Financial Research Specialist in the Analytical Integration Unit of the Security Division, eventually being promoted to his most recent position.

23.  Plaintiff has served the FBI with distinction and without incident since 2003.

24.  Plaintiff was rated successful in his 2010 Performance Appraisal Report and outstanding on his 2011 and 2013 reports.

25.  Plaintiff received three individual time off awards in 2004, 2006 and 2007; a group time off award in 2005 and an individual cash award in 2008.

26.  Plaintiff has held a security clearance since 2003 without incident.

27.  Prior to 2013 the Plaintiff had undergone two mandatory FBI polygraph exams as part of the security clearance investigative process.

28.  The first polygraph was in 2003 as part of his pre-hire evaluation process.

29.  The second polygraph was in 2008 during Plaintiff's periodic renewal investigation.

30.  Upon information and belief the Plaintiff passed both of these polygraph exams without incident or concerns as the Plaintiff was initially granted and subsequently retained his security clearance.

31.  Plaintiff was notified that there had been heavy breathing on his 2008 exam but that, apparently, did not raise any significant concerns.

32.     Plaintiff at no time has ever reviewed any documentation or videos regarding polygraph examination countermeasures and has never intentionally searched for information on how to beat any such examination.

33.     Plaintiff disclosed to the examiner in 2013 that he had read peer reviewed research regarding polygraph examinations in general, as part of his job research, specifically a 2002 report from the National Academy of Science commissioned by President George W. Bush.

34.     In July of 2013 the Plaintiff was contacted by the Security Division regarding the scheduling of his ten-year routine periodic polygraph exam for the second week of September, 2013.

35.     This exam was conducted by a SSA Kevin McCaskey, who upon information and belief specialized in criminal investigations not routine periodic security clearance review exams.

36.     During the examination the Plaintiff was advised by McCaskey that there were problems repeatedly arising in his response to three questions relating to the unauthorized release of information, terrorism and failure to disclose a security violation.

37.     After several runs of the questions McCaskey outright accused the Plaintiff of lying to him and trying to conceal relevant information from him.

38.     Plaintiff vehemently denied this repeatedly and this back and forth with McCaskey went on for nearly two hours.

39.     During this time the demeanor and attitude of McCaskey, as perceived by the Plaintiff, appeared to be one of bias and antagonism on the part of McCaskey towards the Plaintiff because of the Plaintiff's Chinese ancestry.

40.     At the end of the exam McCaskey demanded that the Plaintiff give a written statement of explanation for his failure and refused to let the Plaintiff leave until he provided one.

41.     Plaintiff eventually provided a written statement that denied any wrongdoing on his part, denied withholding any information or employing any testing counter measures.

42.     It wasn't until nearly one year later that the Plaintiff heard anything further on his examination from the Security Division.

43.      In August of 2014 Plaintiff was notified by the Analysis and Investigation Unit that he needed to take a second polygraph examination which was scheduled for September 24, 2014.

44.     This second examination was conducted by a different examiner, Special Agent ("S.A.") Shannon.

45.     S.A. Shannon informed the Plaintiff that he had reviewed his file and been briefed on the failed/untruthful results of the 2013 examination, indicating potential coordination between the examiners.

46.     It was during pre-test questioning that S.A. Shannon made certain remarks that not only exacerbated the Plaintiff's anxiety about the test but were highly inappropriate and unprofessional.

47.     In particular, S.A. Shannon began a series of questioning regarding the Plaintiff's exposure to environments where others spoke primarily dialects of Chinese, even though the Plaintiff answered the first question of this series, "do you speak Mandarin or another dialect of Chinese?" with a response of "no".

48.     These remarks led the Plaintiff to conclude that this examiner, like S.A. McCaskey had an attitude and demeanor hostile to the Plaintiff due to his Chinese ancestry.

49.     S.A. Shannon, for example, chastised the Plaintiff for having read the 2002 National Science Academy Report, accusing him of reading up on the test.

50.     S.A. Shannon indicated to the Plaintiff that based on his interpretation of the technical results, he would be failing him on the test and said that the interpretation included a determination of use of "countermeasures".

51.     In S.A. Shannon's expert opinion, having greater number of breaths after answering a given question can only be explained by one cause, an attempt to cheat the examination.

52.     On the FBI's own accord, the Security Division would later submit Plaintiff's test results to the independent laboratory of the National Center for Credibility Assessment center for excellence.

53.     NCCA returned findings that no evidence was found of countermeasures.

54.     The FBI continued to pursue adverse action of security clearance revocation/employment termination regardless.

55.     S.A. Shannon also suggested that the Plaintiff and his father, a 30 year government employee, were part of a father and son spy team, after taking note that the Plaintiff had been read into a Q Clearance and had done a number of projects with the DOE.

56.     This behavior and conduct by S.A. Shannon set the Plaintiff for another failed test, causing the Plaintiff to suffer a "panic attack" during the test.

57.     S.A. Shannon further exacerbated the matter by warning the Plaintiff that his attempts to counter the test warranted the taking of Plaintiff's badge immediately.

58.      S.A. Shannon's inference that he had the sole authority to confiscate credentials was later learned by the Plaintiff to be not true.

59.     The Plaintiff was then demanded to write a statement explaining his failure of the test and admitting his wrongdoing.

60.     Plaintiff reluctantly wrote a statement, which S.A. Shannon "rejected" by crumpling it up and telling the Plaintiff t was too technical and unless he rewrite the statement under S.A. Shannon's guidance explained "whatever he was hiding" the "people in the back room" will have no choice but to open a counter intelligence investigation on him.

61.     S.A. Shannon in particular criticized the Plaintiff as "you science people" always write too technical.  The FBI produced the subsequent written statement but not the crumpled first submission; previous requests to produce it were ignored.

62.     When posed biographical questions about Plaintiff's father and what was his profession before retirement, Plaintiff responded "yes" when asked whether Plaintiff's father held a security clearance.  The 2014 polygrapher replied: "you seem especially proud of that fact." Plaintiff said "yes" and didn't think anything of that comment at the time until putting it in context with additional unprofessional comments that occurred after.

63.     When posed biographical questions about Plaintiff's father and what was his profession before retirement, Plaintiff responded "yes" when asked whether Plaintiff's father held a security clearance.  The 2014 polygrapher replied: "you seem especially proud of that fact." Plaintiff said "yes" and didn't think anything of that comment at the time until putting it in context with additional unprofessional comments that occurred after.

64.     S.A. Shannon accused Plaintiff of hiding something likely for minor that he was embarrassed about or feeling guilty about and used the example of "sleeping with a foreign girl and not having reported it."

65.     S.A. Shannon continued that if Plaintiff didn't tell him what "minor thing is really bothering you," that his supervisors outside the room will immediately assume that given Plaintiff's usual pride in Plaintiff's father's holding of a security clearance and Plaintiff's own

8

decision to have worked in government/for the FBI for 12 years up to that point that "they will assume you and your father are a part of some Chinese-son spy ring where there's no choice but to open up a counter-intelligence investigation."

66.     S.A. Shannon falsely listed a requirement that an examinee provide a self-written statement, even when Plaintiff said he was unwilling to provide a confession to wrongdoing that he did not do.  The polygrapher said that a written statement is not synonymous with a confession statement, rather a version of facts that tell the examinee's side of the story.  The statement would later be submitted to the DOJ ARC hearings board as a confession statement. After initially refusing, the polygrapher falsely stated that a failure to produce a statement would result in him "pulling your SACs badge right now and you won't even get to go back to your office to get your stuff." He suggested he had these unilateral powers.

67.     Plaintiff reported the discriminatory remarks and behaviors listed above in Plaintiff's "reconsideration declaration" but the investigative file shows that the accusations were never even investigated.  The security division never interviewed the 2014 polygrapher, S.A. Shannon about Plaintiff's accusations.

68.     On 12/31/2014 the Plaintiff was advised by letter that his security clearance was being suspended indefinitely and he was being placed on unpaid leave.

69.     Plaintiff was not afforded an opportunity to appeal this decision or the option of a post adjudication risk management plan before the suspension was made effective, a violation of CFR and written policy/a FBI Electronic Communication requiring any employee accused of failing a routine polygraph to be granted a Senior Review Panel hearing before any adverse action is taken.  Employees are to be given 30 days-notice and an opportunity to contest allegations

underlining a Statement of Reasons for proposed suspension BEFORE any suspension should begin.

70.     This same policy document clearly states that unfavorable polygraph results by an employee alone cannot result in adverse action.

71.     The FBI violated multiple mandates of its own policy and federal law.

72.     On 2/25/15 the Plaintiff was notified that his security clearance was being permanently revoked.

73.     Plaintiff subsequently appealed this decision which was denied by the Assistant Director of the Security Division.

74.     The only basis for both the suspension and final revocation of Plaintiff's security clearance was a violation of the Personal Conduct Policy as it related to his failure of the polygraph examination, his employment of suspected counter measures.

75.     No other evidence of misconduct or wrongdoing by the Plaintiff has ever been put forth by the Defendants.

76.     On or about April 2, 2015, Plaintiff submitted a request for reconsideration of his security clearance revocation.

77.     In August, 2016, the FBI affirmed the decision on reconsideration.

78.     Following said affirmance, in August, 2016, Plaintiff appealed the reconsideration decision to the Department of Justice, Access Review Committee ("ARC").

79.     On or about January 11, 2018, the ARC heard arguments in this matter with respect to the security clearance revocation review.

80.     On said date, Plaintiff appeared for the revocation hearing with his attorney, Mark Zaid, Esq.

81. The ARC deliberated until 6 March 2018 on the evidence and arguments presented at the

hearing, and issued a letter on that date, citing that "[b]ased on the record before it, the ARC is

unable to resolve this conflict because it lacks any verifiable recorded evidence of what Mr. Lee

said to the FBI examiners and what they said to him on these issues.  After further deliberation

on this question, the ARC believes that an additional polygraph examination would be helpful in

reaching a decision, under the following conditions, and it directs the parties to work together in

helping to arrange that examination. After discussions between the ARC and the Drug

Enforcement Administration (DEA), the DEA has agreed to administer an examination to Mr.

Lee using the same questions posed to him during the September 2014 examination." (Exhibit 1 )

82. The DEA scheduled a polygraph test session for 26 March 2018 in Lorton, VA.  Plaintiff

recently had cataract surgery that involved a post-surgery eye drop protocol as a part of recovery.

Mr. Zaid asked the ARC administrator attorney if Plaintiff was required to disclose the use of

these eye drops, despite them being required by the surgeon and not something voluntary on

Plaintiff's part.  Mr. Zaind contacted DEA with this question four days before the test and did

not receive a positive or negative response until the evening of 25 March 2018 at 6pm.  At that

time the DEA informed Mr. Zaid that the testing session was being cancelled.  Mr. Zaid inquired

if by that DEA meant that the session was being cancelled but an alternate rescheduled date

(once the eye drops left Plaintiff's system completely) would be in order, the DEA responded

"no, the test is being cancelled and DEA no longer agrees to administer such a test to Mr. Lee".

83. On or about March 26, 2018, the ARC indicated that it would not force DEA to move

forward to administer the test.  The ARC said it did not have jurisdiction over another polygraph

testing unit to task administering the test, nor did it feel comfortable making  a request to other

agencies within the U.S. intelligence community that also had polygraph testing capabilities of

the same scale and sophistication.  Subsequently, the ARC stated it would order the FBI

polygraph unit to administer the test, despite objections by Mr. Zaid that doing so would, at best,

be a conflict of interest, and at worst, would subject me to the same biased testing

practices/tradecraft that the 2014 polygraph examiner used.

84. Plaintiff agreed to take a test that the FBI polygraph unit scheduled for April 26, 2018 at

Patriots Plaza in Southwest Washington, DC.

85. Plaintiff arrived at the Patriots Plaza testing center around 9:30am to be checked in by

security and complete required sign-in paperwork.  Approximately 10:15am, a Stacy Sabilla

[phonetic] came out to the waiting room to greet Plaintiff.

86. Mr. Sabilla began by providing a summary/review of what he knew about the reasons for

Plaintiff's taking the test that day, including his acknowledgement that he knew it was a re-test,

that Plaintiff previously had "failed multiple examinations" and was suspected by the last

examiner specifically using countermeasures to thwart the test. He further said that he was aware

of Plaintiff's allegations of ethnic bias, bullying practices and procedural rights violations that I

made during the revocation reconsideration stage of the process as well as similar complaints

relayed to the ARC.

87. Mr. Sabilla said that he and his unit determined after much "extensive investigation" that two

articles written about an anonymous complainant regarding experiences with perceived

inappropriate polygraph testing practices, by Fox News and the Huffington Post respectively,

was covering Plaintiff's case and that Plaintiff's attempt to "cowardly hide my identity while

posing knowing false disparaging remarks about the FBI's upstanding polygraph program"

failed.

88. Plaintiff responded that he participated as a source of the article anonymously for a single reason, none of which was to prevent the FBI knowing that Plaintiff was the focus of the article. That reason was Plaintiff's effort to adhere to FBI Security Division rules that an employee, even those of overt status, will not broadly advertise his/her affiliations as an intelligence officer of the U.S. government.

89. Mr. Sabilla also said, in his opinion, Plaintiff's article also leaked sensitive "means, modes and methods" of personnel security mission work of the FBI and other security agencies, a violation that could be criminally prosecutable.

90. Up to this point, Mr. Sabilla remained composed and soft-spoken.  However, he transitioned from discussing the articles to stating that "I personally know your last polygraph examiner very well" and "I know that he would never speak an ounce of racist rhetoric."  He accused Plaintiff of trying to sully his name in Plaintiff's vain attempts to avert from bad judgment in using countermeasures to throw off the test, a worse "sin" than lying on the questions.  He then, while making a wagging-finger gesture, raised his voice just a little and said that if Plaintiff played "those kind of games with him", he would not put up with "that kind of crap" and that he would have no hesitations in "jamming [me] up real good."  The Fox Article, "Attorney: FBI singling out Chinese-Americans with insider-threat program" (Exhibit 2 ) delved into the FBI singling out Chines-Americans by manipulating polygraph tests. One such manipulation was that in a routine polygraph test the FBI claimed that the employee had used countermeasures to affect the test's accuracy. Id. The article further cited an expert, Tom Mauriello had been quoted saying that the countermeasure (CM) is the intentional manipulation of the polygraph subjects' physiology by the subject with the explicit intent to distort their reactions. Id.

91. Mr. Sabilla then began the pre-test biographic questions.  None of those questions appeared out of the ordinary.  Under the question about whether Plaintiff spoke any foreign languages with a fluency, where Plaintiff responded "no", he did not ask Plaintiff a series of follow-up questions about being exposed to foreign language spoken around to Plaintiff by others, especially those of a relationship of affection, as did his colleague Mr. Shannon.  He did, however, ask Plaintiff to recite, how many years again did your father work for the government?" Plaintiff responded nearly 30 years.  He followed up by asking, "exactly 30 years or was it 29 and a half?" and then also "for which agency again?"

92. He ended the questioning with "why do you think you failed the last couple of tests?" Plaintiff responded that he didn't believe he had failed any of the previous tests, but that if the instruments registered any physiological arousal it was because of the increased harassment and antagonism that his colleague, Mr. Shannon, displayed with curt remarks, slamming down of papers on the desk and sighing that increased after each run of the questions in that session.

93. Sabilla, vocally berated Plaintiff for sullying the reputation of "a colleague I know well", referring to the 2014 polygrapher.  He said he was aware of the "antics and garbage" Plaintiff used in that test and would have none of that nonsense in his exam.

94. After Mr. Sabilla asked Plaintiff to get up from the pre-test interview chair and move into the polygraph testing chair, Plaintiff asked him for his permission to close his eyes throughout the test.  Plaintiff informed him that Plaintiff made this request in all the other polygraphs throughout his career and every examiner agreed.  Plaintiff also stated that he recently had cataract surgery, making his eyes more sensitive and tired under florescent office lighting.  He denied Plaintiff request.

95. On several occasions during the test iterations he would say that he saw Plaintiff's eye lids getting heavy and he needed to open up as wide as he could for him.  It was a strain to worry about ensuring Plaintiff's eye lids remained open, and that Plaintiff was also properly concentrating on responding to the questions given during the test iterations

96. Mr. Sabilla hooked Plaintiff up to the instruments and then ran the "practice test" for calibrating the machine, to think of a number in Plaintiff mind but say "no" even if Sabilla asked if the correct number is the number Plaintiff was thinking.

97. At the conclusion of the test, Mr. Sabilla left the room briefly to consult with his quality assurance officer.  He returned to the testing room and said "So, I have good news for you.  You passed on all the relevant questions.  I know you're not a spy, and not a terrorist.  You do have some blips on the questions about security violations, but you passed those as well."

98. He continued "[B]ut to resolve those blips, we need to hook you back up and run a series of questions regarding the article you participated in because I think you  have some guilt that you leaked classified information about testing practices even if you didn't realize it---and  I personally think you did do that."

99.  Plaintiff told Sabilla that the ARC said in their instructions that testing was specifically around the scope of the 2014 testing session's questions.  Those questions would not have to be verbatim but would have to be asking about the same issues, not new issues like things that happened in 2015 to present.  He disagreed and said that he could not move forward with presenting his report of Plaintiff's passing the re-tested 2014 questions until this new series was taken.

100.     Plaintiff requested to consult with his attorney.  Mr. Sabilla provided Plaintiff  access to a landline and set up a cubicle for Plaintiff and had another security employee stand watch.

101.    Plaintiff contacted his attorney. Mr. Zaid told Plaintiff that he was in the process of

having a phone conversation with the FBI's assigned Office of General Counsel attorney

representing personnel security matters.

102.    Ultimately, Plaintiff left the facility for home at about 2:30pm and the OGC attorney told

Mr. Zaid that he instructed Mr. Sabilla to turn in his report and conduct no additional questions,

meaning that Plaintiff would not have to return for more testing.

103.    The ARC's final decision letter of 2 June, Mr. Sabilla had made the unilateral decision---

under what he believed was his sole discretion---to void the passing results on the 2014 re-tested

questions because of "non-cooperation" to conduct new questions on suspected security

violations of intentional information leakage, of potentially classified information.

104.    The government must establish a violation of one or more of the clearance adjudicative

guidelines. In Plaintiff's case, the FBI cites Adjudicative Guideline E, on the grounds of use of

countermeasures---an intentional action to thwart the test.

105.    The ARC's May 30, 2019, letter did not conclude that Plaintiff was untruthful in any of

his polygraph examinations.

106.    Said letter stated that it was not possible to recreate the 2014 polygraph examination.

107.    Although said letter indicated that Plaintiff's 2018 polygraph results indicated deception,

Plaintiff still passed the polygraph. The deception Sabilla noted was (a) blips that were not large

enough to indicate that Plaintiff was untruthful in his examination; and/or (b) Plaintiff's refusal

to answer additional questions for which the ARC did not authorize. Once the Plaintiff passed

the 2018 polygraph, Sabilla should have simply passed the Plaintiff and ended the inquiry. In

addition, Sabilla, as in the Fox Article, attempted to manipulate the results of the test by

attempting to interfere with the Plaintiff's physiology. If there were blips, they were only caused

16

by Sabilla's threatening statements, demeanor and behavior against the Plaintiff. Had Sabilla not

been motivated by Plaintiff's race, national origin, prior discrimination complaint, or First

Amendment exercise, he would have simply passed the Plaintiff

## CLAIMS

## I.     NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF TITLE VII 2014 POLYGRAPH

108.    Plaintiff reallages and re-avers all prior paragraphs as set forth herein.

109.    Defendant's Polygraph examiners conduct during the polygraph examinations resulted in

failed examinations of Plaintiff.

110.    The results of the polygraph examinations were and are the proximate cause of the

revocation of the Plaintiff's security clearance and subsequent termination of his employment

with the FBI.

111.    Defendant's conduct in the manner in which they administered the polygraph

examinations was not within generally accepted guidelines for administration of the polygraph.

112.    Defendant's conduct in the manner of conducting interview practices was not within

generally accepted guidelines for same.

113.    Plaintiff is of Chinese-American national origin, U.S. citizen by birth.

114.    Other similarly situated employees not of Plaintiff's national origin were not subject to

the same conditions of employment as Plaintiff.

115.    A causal connection exists between Defendant's discriminatory actions and Plaintiff's

national origin.

116.    Plaintiff's national origin was the motivating factor for Defendant's aforementioned

actions against Plaintiff.

117.    Defendant's actions constituted a violation of Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000(e) et seq.

118.    Defendant's conduct was malicious, willful, and intentional.

119.    Plaintiff has suffered substantial economic, reputational, and compensatory damages as a result of Defendants actions.

120.    Plaintiff has also suffered anguish, anxiety, fear, helplessness, shock, humiliation, insult, embarrassment, depression, insomnia, and other damages as a direct result of Defendant's acts and omissions.

121.    On or about June 14, 2018, Plaintiff contacted the EEO office to file an informal EEO Complaint.

122.    Plaintiff filed a formal EEO complaint on or about July 18, 2018, Plaintiff filed a formal EEO complaint. Plaintiff's formal complaint stated that on June 1, 2018, he was notified that the ARC affirmed the FBI Security Division's security clearance revocation.

123.    Said complaint stated that false statements were made the polygrapher in the 2018 polygraph test.

124.    Said complaint stated that the 2018 polygrapher's actions were a result of reprisal from allegations that Plaintiff made about ethnic discrimination experienced by another polygrapher in September, 2014, who the polygrapher admitted he knew and with whom he was friendly.

125.    Said complaint also complained about the discrimination Plaintiff faced as far back as 2014 and referenced the 2014 polygraph examination.

126.    Ultimately, the decision affecting Plaintiff's security clearance revocation in 2015 was remanded in 2018 by the ARC.

127.    The May 30, 2018, ARC letter effectively either reinstated the earlier 2015 revocation decision or made it a final action to which there was no other route of appeal.

## II.    RACE DISCRIMINATION IN VIOLATION OF TITLE VII
## 2014 POLYGRAPH

128.    Plaintiff realleges and re-avers all prior paragraphs as set forth herein.

129.    Plaintiff is of the Mongoloid Race.

130.    Other similarly situated employees not of Plaintiff's race were not subject to the same conditions of employment as Plaintiff.

131.    A causal connection exists between Defendant's discriminatory actions and Plaintiff's race.

132.    Plaintiff's race was the motivating factor for Defendant's aforementioned actions against Plaintiff.

133.    Defendant's actions constituted a violation of Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000(e) et seq.

134.    Defendant's conduct was malicious, willful, and intentional.

135.    Plaintiff has suffered substantial economic and compensatory damages as a result of Defendants actions.

136.    Plaintiff has also suffered anguish, anxiety, fear, helplessness, shock, humiliation, insult, embarrassment, depression, insomnia, and other damages as a direct result of Defendant's acts and omissions.

## III.    RETALIATION IN VIOLATION OF TITLE VII
## 2018 ACTIONS OF STACY SABILLA

137.    Plaintiff realleges and re-avers all prior paragraphs as set forth herein.

138.    Plaintiff complained about discrimination in 2014.

139.    Stacy Sabilla at the very least perceived that Plaintiff complained about discrimination regarding the administration of his 2014 polygraph examination.

140.    Sabilla took the actions he did as stated above because of Plaintiff's complaints.

141.    Plaintiff's aforesaid complaints were a motivating factor for Sabilla to take the actions he did against Plaintiff.

142.    Other similarly situated employees who didn't complain about discrimination or weren't perceived to,  were not subject to the same conditions of employment as Plaintiff.

143.    A causal connection exists between Defendant's discriminatory actions and Plaintiff's discrimination complaints.

144.    Defendant's actions constituted a violation of Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000(e) et seq.

145.    Defendant's conduct was malicious, willful, and intentional.

146.    Plaintiff has suffered substantial economic and compensatory damages as a result of Defendants actions.

147.    Plaintiff has also suffered anguish, anxiety, fear, helplessness, shock, humiliation, insult, embarrassment, depression, insomnia, and other damages as a direct result of Defendant's acts and omissions.

148.    Plaintiff exhausted this claim both in his informal and formal complaint.

## IV.    DISCRIMINATION BASED ON NATIONAL ORIGIN IN VIOLATION OF TITLE VII-  2018 ACTIONS OF STACY SABILLA

149.    Plaintiff reallages and re-avers all prior paragraphs as set forth herein.

150.    Plaintiff's national origin was a motivating factor for Sabilla to take the actions he did against Plaintiff.

151.    Other similarly situated employees not of Plaintiff's national origin were not subject to the same actions by Sabilla in 2018.

152.    A causal connection exists between Plaintiff's national origin and Sabilla's actions.

153.    Defendant's actions constituted a violation of Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000(e) et seq.

154.    Defendant's conduct was malicious, willful, and intentional.

155.    Plaintiff has suffered substantial economic and compensatory damages as a result of Defendants actions.

156.    Plaintiff has also suffered anguish, anxiety, fear, helplessness, shock, humiliation, insult, embarrassment, depression, insomnia, and other damages as a direct result of Defendant's acts and omissions.

157.    Plaintiff exhausted this claim both in his informal and formal complaint.

## V.    DISCRIMINATION BASED ON RACE IN VIOLATION OF TITLE VII-  2018 ACTIONS OF STACY SABILLA

158.    Plaintiff realleges and re-avers all prior paragraphs as set forth herein.

159.    Plaintiff's race was a motivating factor for Sabilla to take the actions he did against Plaintiff.

160.    Other similarly situated employees not of Plaintiff's race were not subject to the same actions by Sabilla in 2018.

161.    A causal connection exists between Plaintiff's race and Sabilla's actions.

162.    Defendant's actions constituted a violation of Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000(e) et seq.

163.    Defendant's conduct was malicious, willful, and intentional.

164.    Plaintiff has suffered substantial economic and compensatory damages as a result of Defendants actions.

165.    Plaintiff has also suffered anguish, anxiety, fear, helplessness, shock, humiliation, insult, embarrassment, depression, insomnia, and other damages as a direct result of Defendant's acts and omissions.

166.    Plaintiff exhausted this claim both in his informal and formal complaint.

## VI.    FIFTH AMENDMENT VIOLATION OF DUE PROCESS

167.    Plaintiff reallages and re-avers all prior paragraphs as set forth herein.

168.    Plaintiff has a liberty interest in securing his reputation. Everywhere he applies for employment, Plaintiff will likely have to report that he lost his security clearance; was accused of being a Chinese spy; and that the FBI couldn't conclude that he didn't use countermeasures or deception to beat a polygraph. Future employers' picture of Mr. Lee is that he really is the leader of a Chinese spy ring, who was seeking to plant himself in the FBI or other agency to spy on the United States and he failed a polygraph.

169.    Defendants acted under color of law in participating in actions which naturally and proximately caused the termination of Plaintiff's employment on the basis of pretextual and untrue statements regarding Plaintiff's alleged deception in the participation of polygraph examinations.

170.    The actions were caused by Agents Sabilla and Marie Barr Santangelo, the individual who issued the May 30, 2018 letter.

171.    The actions were also caused by the polygrapher in 2014, whose actions effectively became final in 2018, when the May 30, 2018, letter referenced the 2014 polygraph.

172.    These Agents were involved in either the investigative or decision making process thereby causing the Plaintiff's termination.

173.    173.The Defendants' actions affectively excluded Plaintiff from a broad range of jobs in his chosen field.

174.    The Defendants' actions effectively excluded Plaintiff from the same kind of work in governmental opportunities.

175.    Plaintiff was ultimately terminated because he failed a polygraph and the ARC didn't overturn the decision in 2018, due in part to the actions of Sabilla and Santangelo.

176.    Plaintiff was not terminated because he was dishonest, deceitful, a Chinese spy or for any other reason.

177.    The aforementioned actions, including but not limited to, Sabilla going beyond the mandate of ARC's instructions on the 2018 polygraph examination, the harassment that Sabilla caused Plaintiff during the encounter and the ARC's upholding of the prior results, even though Plaintiff passed the 2018 polygraph were all actions in which Plaintiff was denied due process.

178.    Plaintiff has to report that he lost his security clearance for the rest of his career.

179.    Since his termination, Plaintiff has applied to a number of jobs in the intelligence field (see attached) and he did not receive any. On many applications, though it looked promising Plaintiff was ultimately told at least indirectly that his prior experience with the FBI and security clearance loss was a large negative against his application (Exhibit 3).

180.    As a result of Plaintiff's loss of Due Process, and damage to his reputation, he has suffered economic and non-economic harm and other damages as a direct result of Defendant's acts and omissions.

## VII.    FIFTH AMENDMENT VIOLATION OF EQUAL PROTECTION

181.    Plaintiff realleges and re-avers all prior paragraphs as set forth herein.

182.    Plaintiff was not provided Equal Protection under the law

183.    As a result of Plaintiff's loss of Due Process, and damage to his reputation, he has

suffered economic and non-economic harm and other damages as a direct result of Defendants'

acts and omissions.

## VIII.   BIVENS CLAIM AGAINST STACY SABLLA FOR VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS TO FREE SPEECH

184.    Plaintiff realleges and re-avers all prior paragraphs as set forth herein.

185.    The aforementioned national articles in which Plaintiff's then attorney Mark Zaid

186.    was interviewed centered on discrimination against Chinese Americans.

187.    The Fox News Article's headline was "Attorney: FBI singling out Chinese Americans

with insider-threat program. It didn't list the Plaintiff by name. Mr. Zaid did not make the focus

of the article on one person in particular, let alone Jason Lee, but rather he described a much

larger problem affecting, in essence, the entire country. The Huffington Post article delved into

the same issues regarding the countermeasures and stated among other things that the job of the

polygrapher is to know and apply the difference between innocent and typical anxiety with

intentional deception of the polygraph. (Exhibit 4). Moreover, the article stated, as happened to

Jason Lee, there is no physiological indicator to show a subject used of countermeasure. That

article cited both Mark Zaid and Chuck Grassley (R-Iowa). Certainly, that was a matter of public

concern well beyond this Plaintiff's own situation.

188.    Defendant Sabilla perceived that Plaintiff was referenced in these articles.

189.    The matters in these articles were of public concern.

190.    The employee, to the extent that he spoke, spoke as a citizen, not as an employee.

191.     These articles were not part of Plaintiff's job duties.

192.     The matters in these articles were fairly considered as relating to any matter of political, social, or other concern to the community, rather than just dealing with Plaintiff's own situation.

193.     Defendant Sabilla retaliated against Plaintiff because either because he knew that Plaintiff contributed to those articles his attorney spoke in his name as Plaintiff's attorney, is an extension of Plaintiff  or because Sabilla perceived one of these things  that Plaintiff exercised his First Amendment rights.

194.     Plaintiff, through his attorney or Plaintiff's attorney's exercise of his First Amendment Rights  was a motivating factor in Sabilla's retaliation against Plaintiff.

195.     Sabilla's retaliation included all of the actions that occurred in 2018 at the polygraph encounter.

196.     Sabilla's aforementioned actions were motivated by his perception that Plaintiff was involved in the aforementioned articles.

197.     As a result, Plaintiff suffered economic and non-economic harm and other damages as a direct result of Defendants' acts and omissions.

### IX.     BIVENS CLAIM AGAINST STACY SABLLA FOR VIOLATION OF PLAINTIFF'S FIFTH AMENDMENT RIGHTS TO DUE PROCESS

198.     Plaintiff reallages and re-avers all prior paragraphs as set forth herein.

199.     Sabilla's aforementioned actions in 2018, denied due process to Plaintiff.

200.     As a result, Plaintiff suffered economic and non-economic harm and other damages as a direct result of Defendants' acts and omissions.

### X.   BIVENS CLAIM AGAINST STACY SABLLA FOR VIOLATION OF PLAINTIFF'S FIFTH AMENDMENT RIGHTS TO EQUAL PROTECTION

201.   Plaintiff realleges and re-avers all prior paragraphs as set forth herein.

202.   Sabilla's aforementioned actions in 2018, denied equal protection to Plaintiff.

203.   Members outside of Plaintiff's race and/or national origin were not treated in the same manner as Plaintiff was by Sabilla.

204.   As a result, Plaintiff suffered economic and non-economic harm and other damages as a direct result of Defendants' acts and omissions.

### XI.   BIVENS CLAIM AGAINST MARIE BARR SANTANGELO FOR VIOLATION OF PLAINTIFF'S FIFTH AMENDMENT RIGHTS TO DUE PROCESS

205.   Plaintiff realleges and re-avers all prior paragraphs as set forth herein.

206.   Santangelo's  aforementioned actions in 2018, in addition to not properly investigation the source or cause of the alleged inconclusive results of the 2018 polygraph test, such as the intentional manipulation of Sabilla to affect Plaintiff's physiology, denied due process to Plaintiff.

207.   The ARC letter signed by her states that "the results of that examination process in the record before us are at best inconclusive and at worst provide some grounds for believing either that Mr. Lee has been deceptive, used countermeasures or both.

208.   As a result, Plaintiff suffered economic and non-economic harm and other damages as a direct result of Defendants' acts and omissions.

## RELIEF REQUESTED

WHEREFORE, the Plaintiff requests that this Court grant him the following relief:

1.      That the Court enter and order declaring that the Defendant has violated Plaintiff rights under Title VII;

2.      That the Court issue an order directing the defendants to reinstate the plaintiff to the position he would have held were it not for the discrimination against him and him full back pay and other benefits related to his employment;

3.      That the Court order the Agency to pay compensatory damages, including but not limited to, lost back pay, plus interest, lost fringe benefits and future lost earnings and fringe benefits, damages for emotional distress and pain and suffering, according to proof allowed by law;

4.      That the Court grant Plaintiff compensatory damages for the humiliation, emotional distress, and other damages caused by Defendants' conduct;

5.      That the Court grant Plaintiff all employment benefits he would have enjoyed had he not been discriminated and retaliated against;

6.      That the Court grant Plaintiff expenses of litigation, including reasonable attorneys' fees;

7.      That the Court grant Plaintiff an award of prejudgment and post-judgment interest;

8.      That the Court grant Plaintiff all other relief the Court deems just and proper.

9.      That the Court grant Plaintiff a *Codd* hearing to clear his name.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all issues to which he is entitled to a jury trial under

law.

> _Morris E. Fischer, Esq./s/_
> Morris E. Fischer, Esq.
> Morris E. Fischer, LLC
> 8720 Georgia Avenue, Suite 210
> Silver Spring, MD 20910
> 301- 328-7631 Office
> 301- 328-7638 Fax
> Attorney for Plaintiff